IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 23-205 |
| | : | |
| ROBERT HYDOCK | : | |

### MEMORANDUM

**Padova, J.**                                                                                                                                                   **December 20, 2023**

Defendant Robert Hydock was indicted on May 9, 2023 for a single charge: possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Hydock now moves to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(1), arguing that § 922(g)(1) is unconstitutional both facially and as applied. For the reasons that follow, Hydock's Motion is denied.

### I.   FACTUAL AND PROCEDURAL BACKGROUND

The Indictment alleges that on December 14, 2022, Robert Hydock, knowing he had previously been convicted of a crime punishable by imprisonment of more than one year, knowingly possessed a semi-automatic pistol loaded with 13 rounds of live ammunition. (Indictment at 1.) Hydock's prior criminal record is not in dispute. On August 7, 2000, Hydock was convicted of Aggravated Assault, Flight to Avoid Apprehension, Trial, or Punishment, Possession of an Instrument of Crime, Recklessly Endangering Another Person, and Resisting Arrest, for which he was sentenced to 5 to 10 years' imprisonment, followed by a term of probation. (Stipulation of Undisputed Facts ("Stip. Facts"), Docket No. 20, at 1.) On April 17, 2001, Hydock was convicted for his part in a multi-county burglary scheme of Corrupt Organizations, Criminal Conspiracy, and 26 counts of Burglary, for which he was sentenced to 17 to 35 years' imprisonment, followed by multiple terms of probation. (Id. at 2.) Also on April 17,

2001, Hydock was convicted of Escape, for which he was sentenced to 3½ to 7 years' imprisonment. (Id.) All told, at the time Hydock is alleged to have possessed a firearm, he had been convicted of over thirty crimes punishable by more than one year, each sufficient to make him ineligible to possess firearms under § 922(g)(1). (See Gov. Resp. at 4.)

In the instant Indictment, Hydock is charged with a single count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Hydock moves to dismiss the Indictment, arguing that § 922(g)(1) violates the United States Constitution, and more specifically, is: 1) unconstitutional under the Second Amendment as applied to him; 2) unconstitutional under the Second Amendment on its face; 3) unconstitutionally vague under the Due Process Clause of the Fifth Amendment; and 4) an unconstitutional exercise of the commerce power. The Government opposes the Motion. On December 4, 2023, we heard oral argument on the Motion, and we also received both a Stipulation of Undisputed Facts and testimony offered by the Government from Philadelphia Police Detective Donald Liebsch about the circumstances of the firearm's discovery.[1] The Motion is now ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(1) permits parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." This includes challenges to the constitutionality of the charging statute. See Fed. R. Crim. P. 12(b)(3)(B)(v) (permitting a defendant to move to dismiss an indictment for failure to state an offense); see also United States v. Ho Ka Yung, Crim. A. No. 17-14-LPS, 2018 WL 619585, at *1

---

[1] While Hydock did not object to this testimony, the Court cannot consider facts not alleged in the Indictment on a motion to dismiss, as discussed in Part II. Regardless, the additional facts introduced by the Government are unnecessary to our disposition.

(D. Del. Jan. 30, 2018) ("An indictment is defective if it alleges a violation of an unconstitutional statute." (quotations omitted)), aff'd sub nom. United States v. Yung, 37 F.4th 70 (3d Cir. 2022).

In evaluating a motion to dismiss under Rule 12(b)(1), the Court "must accept as true the factual allegations set forth in the indictment." United States v. Huet, 665 F.3d 588, 595 (3d Cir. 2012) (citing United States v. Sampson, 371 U.S. 75, 78–79 (1962); United States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir.1990)), abrogated on other grounds by Rehaif v. United States, 139 S. Ct. 2191 (2019).  Here, the parties agree that we may also consider certain additional stipulated facts.  (See Stip. Facts.)  Disputed facts not alleged in the indictment are not properly considered at this stage.  See Fed. R. Crim. P. 12(b)(1) (limiting pretrial motions to those "that the court can determine without a trial on the merits"); Huet, 665 F.3d at 601 (explaining that in reviewing motion to dismiss indictment based on unconstitutionality of charging statute, "we are limited to determining whether, based on the allegations in the Indictment—and only the allegations in the Indictment—[the defendant's] Second Amendment rights have been violated").

**III.   DISCUSSION**

Hydock argues that § 922(g)(1) is unconstitutional on multiple grounds and the Indictment must therefore be dismissed.  Section 922(g)(1) prohibits "any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" from "possess[ing] in or affecting commerce, any firearm or ammunition."  18 U.S.C. § 922(g)(1).

A.   As-Applied Second Amendment Challenge

Hydock first argues that § 922(g)(1), as applied to him, violates the Second Amendment to the United States Constitution.  The Second Amendment secures "the right of the people to keep and bear arms[.]"  U.S. Const. amend. II.  In District of Columbia v. Heller, 554 U.S. 570 (2008), and McDonald v. City of Chicago, 561 U.S. 742 (2010), the Supreme Court established that the

Second Amendment encompasses an individual right to bear arms for self-defense. New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 17 (2022). Subsequently, in Bruen, the Supreme Court clarified the test for whether a firearm regulation comports with this Second Amendment right. Bruen instructs us to "first decide whether the text of the Second Amendment applies to a person and his proposed conduct." Range v. Att'y Gen. United States of Am., 69 F.4th 96, 101 (3d Cir. 2023) (en banc) (citing 142 S. Ct. at 2134-35). "If it does, the government. . . 'must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" Id. (quoting Bruen, 142 S. Ct. at 2127).

In the wake of Bruen, the United States Court of Appeals for the Third Circuit heard Range, which involved an as-applied challenge to § 922(g)(1). Twenty-eight years prior, Petitioner Bryan Range had pled guilty to misrepresenting his income on a food stamp application. Id. at 98. Despite Range never serving a day in prison, his crime was a qualifying predicate offense under § 922(g)(1) because it was punishable by up to five years' imprisonment. Id. Range, who had been law-abiding in the intervening years, argued that the Second Amendment shielded him from being permanently disarmed on the basis of such a conviction. Id. at 99. On en banc review, the Third Circuit agreed. Id. at 106. Applying the Bruen test, the court concluded that § 922(g)(1) was unconstitutional as applied to "people like Range" because the Government had not proffered evidence of a historical tradition of disarming similar individuals. Id. Hydock now argues that the faithful application of Bruen, Range, and the Second Amendment compel the conclusion that § 922(g)(1) is unconstitutional as applied to him as well.

1. Application of Second Amendment to Hydock

As a threshold matter, the Bruen test requires us to determine whether the text of the Second Amendment applies to Hydock. This inquiry is straightforward. No one disputes that Hydock is

4

one of "the people" protected by the Second Amendment. (Def. Mot. at 4; Gov. Resp. at 9.) As the Third Circuit made clear in Range, the Second Amendment applies to all Americans, not only to law-abiding citizens. 69 F.4th at 103.

    2. Application of Second Amendment to Hydock's Conduct

The second question under Bruen is whether the Second Amendment applies to Hydock's conduct. The parties disagree on what the relevant conduct is. Hydock contends that it is the conduct that § 922(g)(1) regulates at a high level—possession of a firearm—which "falls squarely into the heartland of the Second Amendment." (Def. Mot. at 5 (citing Range, 69 F.4th at 103).) The Government counters that the core conduct protected by the Second Amendment is not mere firearm possession, but firearm possession for a lawful purpose such as self-defense. (See Gov. Resp. at 10 (citing Bruen, 142 S. Ct. at 2132).) In the Government's view, because Hydock does not allege a lawful purpose, the relevant conduct is possession of a firearm *for an unlawful purpose*, possession of a *stolen* firearm, and possession of a firearm *in violation of parole*. (See id. at 10-15.)

Neither Bruen nor Range had occasion to discuss the conduct prong in depth. Both involved petitioners in a civil posture seeking to possess arms for lawful self-defense, rendering the conduct question "easy." Range, 69 F.4th at 103; Bruen, 597 U.S. at 32 (concluding with "little difficulty" that "carrying handguns publicly for self-defense" was conduct within the protection of the Second Amendment); see also United States v. Cash, No. 22-2713, 2023 WL 6532644, at *2 n.6 (3d Cir. Oct. 6, 2023) (explaining that Range "focused on who could possess a firearm," not "on how a person may possess a firearm"). The conduct inquiry here, in contrast, is less straightforward. Moreover, at the motion to dismiss stage we are reluctant to consider facts that are neither alleged in the Indictment nor included in the parties' stipulation of facts. Ultimately,

we conclude that resolution of the conduct question is not essential to our resolution of the instant Motion. Accordingly, for purposes of this Motion only, we will simply assume *arguendo* that the Second Amendment applies to Hydock's conduct.

### 3. Historical Tradition of Regulations Like § 922(g)(1)

Having decided that the Second Amendment applies to Hydock generally, and assumed for purposes of this Motion that it applies to his proposed conduct, we proceed to the final step of the Bruen test. The Government must affirmatively prove that § 922(g)(1), as applied to Hydock, is nonetheless "consistent with the Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 24. Our purpose in examining historical evidence is to illuminate the understanding of the Second Amendment at the founding, thereby determining whether § 922(g)(1) is consistent with the right to bear arms as originally understood. See id. at 20-21. Bruen instructs us to conduct this inquiry by analogical reasoning—seeking evidence of historical regulations analogous to § 922(g)(1). See Range, 69 F.4th at 103 (quoting Bruen, 142 S. Ct. at 2133). Regulations addressing societal problems known at the founding require "distinctly similar" historical analogues, whereas for more modern developments, "relevantly similar" analogues suffice. Id. (quoting Bruen, 142 S. Ct. at 2131-32). In either case, we are not required to identify a "historical *twin*," but only a "well-established and representative historical *analogue*." Id. (quoting Bruen, 142 S. Ct. at 2133).

Bruen highlights two key points of comparison between modern and historical regulations: the nature of the burden imposed by the regulation on the right of armed self-defense (the "how"), and the justification for that burden (the "why"). 597 U.S. at 29. Additionally, Bruen reminds us that "not all history is created equal." Id. at 34. To be relevant, historical evidence must be probative of the scope of the Second Amendment when it was adopted, i.e., in 1791. Id. Earlier

English practices must be shown to have prevailed through the time of the founding.  Id.  Post-ratification history must be probative of longstanding practices, rather than modern developments, and may not countermand the Second Amendment's plain text.  Id. at 35-37.

In its Response, the Government proffers an historical account of firearm regulations from the seventeenth century through to the founding in 1787 and into the early 1800's.  (See Gov. Resp. at 15-20.)  The common thread of this history is the disarmament of dangerous individuals (the "how") in order to nullify the threat they posed to public safety and order (the "why").

The Government begins with the English Militia Act of 1662, which empowered authorities to seize arms from individuals "dangerous to the Peace of the Kingdom," and the use of which continued unabated even after the right to keep and bear arms was established in 1689.  Diarmuid F. O'Scannlain, Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms, 95 Notre Dame L. Rev. 397, 401, 405 (2019) (quotation and citation omitted).

In the American colonies and the early republic, various statutes authorized disarmament of those engaging in dangerous conduct or otherwise individually adjudicated as dangerous.  This included individuals adjudged "disaffected and dangerous to the present Government," as well as those carrying arms in a manner that stoked fear or terror.  Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 Wyo. L. Rev. 249, 264-65 (2020) (quoting 1777 N.J. Laws 90, ch. 40 § 20); Bruen, 597 U.S. at 46-47 (quoting 1692 Mass. Acts and Laws no. 6, pp. 11–12; 1699 N. H. Acts and Laws ch. 1).  Likewise, as the Third Circuit acknowledged in Range, "Founding-era governments disarmed groups they distrusted," including racial minorities and political or religious dissenters.  69 F.4th at 105.

During this same period, proposals at the Pennsylvania and Massachusetts ratifying conventions would have expressly exempted dangerous, criminal, or non-peaceable citizens from Second Amendment protections.  Binderup v. Att'y Gen. United States of Am., 836 F.3d 336, 367 (3d Cir. 2016) (Hardiman, J., concurring in part) (quotations omitted), abrogated by Bruen, 597 U.S. 1.  While never implemented, these proposals shed light on how the right to bear arms was understood because it was a pre-existing right which the Second Amendment merely codified.  See Bruen, 597 U.S. at 20 ("The [Second] Amendment 'was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors.'" (quoting Heller, 554 U.S. at 599)); see also Range, 69 F.4th at 126 (Krause, J., dissenting) (reasoning that an unadopted formulation of the Second Amendment may still reflect "the understanding of the Founding generation" that disarming criminals is consistent with the right to armed self-defense).  For this reason, such proposals were characterized as "highly influential" by the Supreme Court in Heller. Binderup, 836 F.3d at 368 (Hardiman, J., concurring in part) (quotation omitted).

In the mid-nineteenth century, many jurisdictions required "those threatening to do harm" to "post bond before carrying weapons in public."  Bruen, 597 U.S. at 55.  According to an influential commentator at the time, such laws reflected an understanding that the government may properly restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them."  Id. at 56 (quoting William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829)).  This continued into the reconstruction era, when disorderly persons, vagrants, and disturbers of the peace, as well as those convicted of making improper or dangerous use of weapons, were subject to disarmament.  Id. at 62–63 (quotations omitted).

In light of this historical account, we conclude that the Government has met its burden. While not "historical twins," these regulations are analogous to § 922(g)(1) in the critical dimensions of "how" they burden Second Amendment rights and "why" they impose that burden. See id. at 29. They empowered legislatures to strip an individual's right to bear arms based on status or conduct that marked him as dangerous. Cf. Range, 69 F.4th at 102 ("[T]he legislature may constitutionally strip certain groups of [the right to keep and bear arms]." (quotation omitted)). Their purpose was to "protect[] the public from violence and disorder." United States v. Reichenbach, Crim. A. No. 22-0057, 2023 WL 5916467, at *7 (M.D. Pa. Sept. 11, 2023) (collecting sources). Section 922(g)(1) similarly disarms individuals deemed dangerous due to their status as felons, and likewise does so in service of public safety and order. See United States v. Jackson, 69 F.4th 495, 504 (8th Cir. 2023) (observing that, in enacting § 922(g)(1), Congress found that "the ease with which any person can acquire firearms. . . (including criminals. . . whose possession of such weapons is. . . contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States" (quoting Pub. L. No. 90-351, § 901(a)(1), (2), 82 Stat. 225, 225)). As Range demonstrates, these historical analogues may not support lifelong disarmament of every felon, but they do support disarmament where there is a reasonable basis for inferring dangerousness. See United States v. West, Crim. A. No. 23-132, 2023 WL 8091984, at *5 (E.D. Pa. Nov. 21, 2023) ("Section 922(g)(1)'s disarmament—especially as reworked by Range—is consistent with our nation's historical tradition.").

We are not alone in concluding that history supports the disarmament of dangerous felons. Judge Hardiman, the author of Range, concluded as much in an earlier concurrence. Binderup, 836 F.3d at 357 ("The most cogent principle that can be drawn from traditional limitations on the right to keep and bear arms is that dangerous persons likely to use firearms for illicit purposes were

not understood to be protected by the Second Amendment."); see also Range, 69 F.4th at 110 (Ambro, J., concurring) ("[Section 922(g)(1)] fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society."). So did then-Judge Barrett in her Kanter dissent, which the Range court cited with approval. Kanter v. Barr, 919 F.3d 437, 464 (7th Cir. 2019) ("[History] does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous."), abrogated by Bruen, 597 U.S. 1. Other circuit courts and legal scholars have also found history to support the disarmament of dangerous felons. See Jackson, 69 F.4th at 505 ("[L]egislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms."); Greenlee, 20 Wyo. L. Rev. at 257 (finding "a historical justification for violent or otherwise dangerous felons" to be disarmed "consistent with the founding-era understanding of the right [to bear arms]"). And, notably, every court in this district to take up this question since Range was decided has reached this same conclusion.[2] See United States v. Harris, Crim. A. No. 22-441, 2023 WL 7927758, at *1 (E.D. Pa. Nov. 16, 2023) ("The judges of

---

[2] At oral argument, Hydock contended that his case is distinguishable from these other decisions because the firearm in question was allegedly discovered in his home, and not in a car or on his person. (Oral Arg. Tr. at 20-21.) Hydock did not raise this argument in his Motion and has not explained why this difference matters. Section 922(g)(1) makes no distinction based on where a firearm is possessed, nor do any of the historical regulations proffered by the Government. As Bruen emphasized, Second Amendment protections apply both within the home and outside of it. 597 U.S. at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."). Nor have other courts examining § 922(g)(1)'s Second Amendment constitutionality made this distinction. See United States v. Wade, No. 3:22-CR-3, 2023 WL 6037404, at *1 (N.D. Ind. Sept. 15, 2023) ("The issue is whether the Second Amendment permits the government to prohibit felons from owning firearms and not whether the criminal law applies in private residences."); see also United States v. Lanier, Crim. A. No. 22-469, 2023 WL 8255101 (E.D. Pa. Nov. 29, 2023) (upholding § 922(g)(1) indictment based on firearm found in residence where the defendant was living); United States v. Pope, No. 20-282, 2023 WL 7194773 (W.D. Pa. Nov. 1, 2023) (same); United States v. Green, Crim. A. No. 22-387, 2023 WL 6164407 (E.D. Pa. Sept. 21, 2023) (same). In short, even if this argument was properly raised, it is unavailing.

this court have exhaustively discussed [§ 922(g)(1)'s constitutionality in the wake of Range], and without exception have denied relief, finding Range to be limited to its unique facts.") (collecting cases).

Range is not to the contrary. A self-described "narrow" decision, it sustained a challenge to § 922(g)(1) "only as applied to [Range]" after finding no historical tradition of disarming "people like [him]." Range, 69 F.4th at 106. Specifically, the court rejected historical evidence of disarming distrusted groups because the Government did not "successfully analogize those groups to Range and his individual circumstances" or "prove that Range is part of a similar group today." Id. at 104-05. The same is not true of Hydock. See id. at 110 (Ambro, J., concurring) ("That Range does not conceivably pose such a threat says nothing about those who do.") Like those historically disarmed—and unlike Range—Hydock has shown himself to be a threat to public safety and order. He has been convicted of multiple felonies, including dangerous offenses such as aggravated assault and burglary. (See Stip. Facts at 1-2); see also United States v. McCants, Crim. A. No. 22-310, 2023 WL 8436055, at *4 (E.D. Pa. Dec. 5, 2023) ("Aggravated assault, like murder and robbery, is a paradigmatic violent crime[.]"); Taylor v. United States, 495 U.S. 575, 588 (1990) (noting burglary's "inherent potential for harm to persons" due to "the possibility of a violent confrontation between the offender and an occupant, caretaker, or some other person who comes to investigate. And the offender's own awareness of this possibility may mean that he is prepared to use violence if necessary to carry out his plans or to escape"). While these convictions occurred in 2000 and 2001, they resulted in a lengthy period of incarceration followed by multiple terms of probation. (See Stip. Facts at 1-2.) We therefore conclude that the Government has "successfully analogize[d]" Hydock to persons historically disarmed on the basis of dangerousness by proving he is "part of a similar group today." See Range 69 F.4th at 104-05.

Accordingly, we hold that § 922(g)(1) as applied to Hydock is not unconstitutional under the Second Amendment.[3]

### B. Facial Second Amendment Challenge

Hydock also contends that § 922(g)(1) is unconstitutional on its face under the Second Amendment. A facial challenge to a statute is "the most difficult challenge to mount successfully." United States v. Salerno, 481 U.S. 739, 745 (1987). That a law "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." Id. (citation omitted). Thus, to prevail on this argument, Hydock must "establish that no set of circumstances exists under which [§ 922(g)(1)] would be valid." Id.

Given the preceding analysis, he plainly cannot do so. Section 922(g)(1) cannot simultaneously be constitutional as applied to Hydock and unconstitutional on its face. See Knick v. Twp. of Scott, 862 F.3d 310, 321 (3d Cir. 2017) ("[I]f a litigant loses an as-applied challenge because the court rules as a matter of law that the statute or ordinance was constitutionally applied to her, it follows *a fortiori* that the law is not unconstitutional in all applications." (citations

---

[3] Hydock cites three cases where § 922(g)(1) was held to be unconstitutional as applied. See United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 23, 2023); United States v. Quailes, Crim. A. No. 21-0176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023); United States v. Harper, Crim. A. No. 21-0236, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023). Bullock is inapposite. There, the court held that the Government had not met its burden based on a "three-and-a-half-page response brief" which proffered only caselaw and no historical sources. See 2023 WL 4232309, at *29-30 ("Missing from this brief, in sum, is any example of how American history supports § 922(g)(1)[.]"). Here, in contrast, the Government has thoroughly briefed the relevant history. Quailes and Harper likewise do not alter our conclusion. In both cases, the same judge employed substantially similar reasoning to hold that the Government had not sufficiently analogized the "mechanics and purpose" of the proffered historical regulations with those of § 922(g)(1). 2023 WL 5401733, at *12; 2023 WL 5672311, at *13. We do not find this reasoning to be persuasive, and instead, for the reasons given above, conclude that the Government has met its burden. We further note that all three of the cases on which Hydock relies have appeals pending. See Bullock, 2023 WL 4232309, appeal docketed, No. 23-60408 (5th Cir. Jul. 31, 2023); Quailes, 2023 WL 5401733, appeal docketed, No. 23-2533 (3d Cir. Aug. 24, 2023); Harper, 2023 WL 5672311, appeal docketed, No. 23-2604 (3d Cir. Sept. 6, 2023).

omitted)), vacated and remanded on other grounds, 139 S. Ct. 2162 (2019).[4] Moreover, felon-in-possession laws remain "presumptively lawful." See Range, 69 F.4th at 110 (Ambro, J., concurring) ("[W]e [have] held that Heller's list of presumptively lawful regulations is not dicta. . . . Bruen reaffirms that felon-in-possession laws are presumed to be lawful." (quotation and citation omitted)); see also Bruen, 597 U.S. at 72 (Alito, J., concurring) ("[Bruen does not] disturb[] anything that we said in Heller . . . about restrictions that may be imposed on the possession or carrying of guns."); id. at 80 (Kavanaugh, J., concurring) ("[T]he Second Amendment allows a 'variety' of gun regulations," including "longstanding prohibitions on the possession of firearms by felons[.]" (quotation omitted)); id. at 129 (Breyer, J., dissenting) ("I understand the Court's opinion today to cast no doubt on [the "presumptively lawful" regulations] aspect of Heller's holding." (citation omitted)).  This too is incongruous with the suggestion that § 922(g)(1) is unconstitutional on its face.  See Range, 69 F.4th at 111 (Ambro, J., concurring) ("[A] sound basis exists for § 922(g)(1)'s constitutional application in a substantial amount of cases. Any historical inquiry that reaches a contrary result must be wrong in view of the answer the Supreme Court has already supplied." (citing Jackson, 69 F.4th at 501–02)).

In support of his position, Hydock cites Judge Porter's Range concurrence, 69 F.4th at 106 ("[T]here are no examples of founding, antebellum, or Reconstruction-era federal laws like 18 U.S.C. § 922(g)(1) permanently disarming non-capital criminals."), as well as an earlier partial concurrence by Judge Hardiman, Binderup, 836 F.3d at 368 ("[T]he Founding generation had no laws. . . denying the right [to keep and bear arms] to people convicted of crimes." (second and third alterations in original) (quotation omitted)).  Hydock reasons that "[b]ecause there is no

---

[4] On remand, the Third Circuit specifically stated that its prior "opinion stands with respect to the Fourth Amendment claim," which is the portion of the opinion on which we rely.  See Knick v. Township of Scott, 932 F.3d 152 (3d Cir. 2019).

founding-era history of disarming people convicted of felonies," § 922(g)(1) must be unconstitutional in all its applications. (Def. Mot. at 11-12.) But this presumes that we need such a historical "dead ringer," which the Supreme Court has expressly disclaimed. Bruen, 597 U.S. at 30. The lack of historical regulations exactly like § 922(g)(1) is not dispositive when Bruen requires only "a well-established and representative historical *analogue*, not a historical *twin*." Id. Nor did Judge Porter or Judge Hardiman see the absence of historical laws specifically disarming felons as evidence of the Second Amendment's original meaning. Judge Porter posited that it reflected a more limited historical conception of the commerce clause. Range, 69 F.4th at 107-8 (Porter, J., concurring). Judge Hardiman suggested that "lack of political demand" might have been the cause. Binderup, 836 F.3d at 369 (Hardiman, J., concurring in part) (quotation omitted). Moreover, Judge Hardiman went on to conclude that the historical record *did* support the disarmament of those deemed dangerous, as opposed to criminals generally. Id. As such, we find no support in these statements for Hydock's assertion that § 922(g)(1) is unconstitutional on its face.[5]

C. Void for Vagueness

Hydock next argues that, in light of Range, § 922(g)(1) is unconstitutionally vague under the Due Process Clause of the Fifth Amendment to the United States Constitution. A law is unconstitutionally vague when it fails to "give ordinary people fair warning about what the law demands of them." United States v. Davis, 588 U.S. ---, 139 S. Ct. 2319, 2323 (2019) (quotations

---

[5] Hydock also cites Judge Shwartz's Range dissent, where she warned that the majority's approach "rejects all historical support for disarming any felon." See 69 F.4th at 116 & n.5. This critique was premised on Judge Shwartz's view that the majority was improperly demanding "a historical twin," which Bruen did not require. Id. at 114, 116 n.5. Judge Shwartz concluded that § 922(g)(1) passed Bruen's history and tradition test, properly applied. Id. at 113. Accordingly, her dissent does not support the position Hydock advocates.

omitted). "[T]he mere fact that close cases can be envisioned" does not render a statute vague. United States v. Williams, 553 U.S. 285, 305 (2008). "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." United States v. Mazurie, 419 U.S. 544, 550 (1975) (citation omitted). Thus, "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 495 (1982).

Hydock finds support for his vagueness argument in Judge Krause's Range dissent, where she stated that "[u]nder the majority's 'like Range' test, . . . offenders cannot possibly know in advance of a court's retroactive declaration whether possessing a firearm post-conviction is a constitutional entitlement or a federal felony. As interpreted today by the majority, § 922(g)(1) is rendered so vague as to be facially unconstitutional." 69 F.4th at 133.

Section 922(g)(1) prohibits "any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" from "possess[ing] in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). Whatever uncertainty Range creates for those at the margin, the law is clear on its face as to Hydock. Moreover, Hydock cannot credibly claim that Range injected uncertainty for him when the firearm at issue was allegedly found in his possession six months before the en banc decision in Range was issued, at a time when the law of this circuit still held that § 922(g)(1) was constitutional as applied to *any* felon. See Range v. Att'y Gen. United States, 53 F.4th 262, 285 (3d Cir. 2022) (panel decision) (concluding that "our Nation's tradition of firearm regulation permits the disarmament of those who committed felony or felony-equivalent offenses"), rev'd, 69 F.4th 96 (2023) (en banc). We therefore conclude that § 922(g)(1) is not void for vagueness.

D. Commerce Clause

Finally, Hydock seeks to preserve a claim that § 922(g)(1) is unconstitutional under the original understanding of the Commerce Clause, U.S. Const. art. 1, § 8, cl. 3, as suggested by Judge Porter in his Range concurrence. 69 F.4th at 107-09. As Hydock concedes, this argument is presently foreclosed by binding precedent, and is therefore not a basis to dismiss the Indictment. (Def. Mot. at 15 (citing NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937))); see also United States v. Cook, 488 F. App'x 643, 645 (3d Cir. 2012) ("[W]e have consistently held that § 922(g)'s jurisdictional hook is sufficient to bring § 922(g) within the ambit of Congress's commerce powers."). We therefore reject Hydock's commerce clause argument on that basis.

## IV. CONCLUSION

For the foregoing reasons, we hold that § 922(g)(1) is not unconstitutional for any of the reasons Hydock asserts. Accordingly, Hydock's Motion to Dismiss the Indictment is denied. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.